## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF NEW YORK

_____

SHAWN T. SULLIVAN,

                                 Plaintiff,

                                                 DECISION AND ORDER
vs.                                              08-CV-6355 CJS

MICHAEL J. ASTRUE,
Commissioner of Social Security,

                                 Defendant.

_____

## APPEARANCES

For Plaintiff:                            Jere B. Fletcher, Esq.
                                             P.O. Box 10632
                                             Rochester , NY 14610
                                             (585) 271-8142

For the Commissioner:             John J. Field, A.U.S.A.
                                             U.S. Attorney's Office
                                             100 State Street Room 620
                                             Rochester , NY 14614
                                             (585) 263-6760

## INTRODUCTION

**Siragusa, J.** Before the Court is the Commissioner's motion (Docket No. 4) for judgment on the pleadings, as well as a cross-motion (Docket No. 7) by Plaintiff Shawn T. Sullivan ("Plaintiff"), also seeking judgment pursuant to Federal Rule of Civil Procedure 12(c). At issue is the Commissioner's decision which found that Plaintiff had the residual functional capacity ("RFC") to perform a full range of work at all exertional levels, but with two nonexertional limitations: sufficient attention and concentration to under-

stand, remember and follow simple instructions; and limited to occasional interaction with the general public and occasional interaction with coworkers. (Record, at 16.) The Commissioner denied Plaintiff's application for disability and supplemental security benefits. For the reasons stated below, Plaintiff's application is denied, and the Commissioner's motion is granted.

## BACKGROUND

### *Procedural Background*

Plaintiff filed applications on April 11, 2005, for both disability and disability insurance benefits, as well as supplemental security income. In both applications, Plaintiff alleged that his disability began on April 30, 2003. The claims were denied initially on August 10, 2005. On September 6, 2005, Plaintiff requested a hearing, and a hearing was held before Administrative Law Judge ("ALJ") John P. Costello on February 11, 2008. On March 21, 2008, the ALJ issued a decision denying Plaintiff's claim. Then on June 10, 2008, the Appeals Council denied Plaintiff's request for review. Subsequently, on August 8, 2008, Plaintiff filed this action.

### *Education and Work History*

Plaintiff was born on November 23, 1985. (Record, at 66.) He graduated from Victor High School, spent some time at the Honeoye Falls-Lima BOCES Forman Center, and had an Individualized Education Program ("IED"). (Record at 84, 299-300, 316-17.) He attended community college for about a week. (Record, at 304.) He had a number of part time jobs, but none amounted to substantial gainful activity. (Record, at 21.)

*Medical Records*

Plaintiff received treatment from five physicians: Julie Lenhard, M.D.; Mohsen Emani M.D.; Aaron Satloff, M.D.; Vincent Fasanello, M.D.; and Paul Howes, M.D.

Dr. Howes treated Plaintiff from March 18, 2002 until October 13, 2003. (Record, at 126.) In his response to an information request, Dr. Howes wrote:

> Mr. Sullivan treated for Bipolar II Mood Disorder with related and serious substance abuse issues. Mr. Sullivan was moderately invested in therapy, struggled with impulsive decisions and poor choices, all under the influence of abusive substances.
>
> No contact in plus 1.5 years, no current info available.

(Record, at 126.)

Doctor Emami, a psychiatrist, in a letter dated December 17, 2004, stated: that he had cared for Plaintiff since March 2003 after referral by his pediatrician, Dr. Lenhard, and his psychologist, Dr. Howes; that he treated Plaintiff for symptoms of ADHD, mood disorder NOS, particularly experiencing racing thoughts and mood swings, and also substance abuse disorder, particularly cannabis, alcohol and Robitussin; and that he treated plaintiff with a combination of Zoloft 50 mg. at bed time, Trileptal 600 mg. twice a day and Seroquel 75 mg. at bed time. Doctor Emami also wrote that his last appointment with Plaintiff was on October 12, 2004, "at which time he showed no sedation or tiredness and was without any abnormal movements, and his overall mood was stable." (Record, at 136.) Dr. Emami further stated that, in his opinion, plaintiff had benefited from psychotropic medications, "particularly in regard to mood stability and anger management, but his substance abuse has remained a problem and needs further attention. [Plaintiff] has been quite ambivalent regarding seeking rehab

and treatment in this regard." (*Id.*)

The Record contains a letter dated March 3, 2005, from Jo Ann Langer, LMSW, Substance Abuse Counselor. (Record, at 201-02.) Ms. Langer diagnosed Plaintiff with having a dependence on alcohol, cough syrup, cannabis and nicotine, and recommended intensive outpatient treatment. (*Id.*, at 202.) In a contemporaneous Comprehensive Psychosocial Evaluation Summary (Record, at 203-08), Barbara S. Bayley, BA, CASAC, Substance Abuse Counselor, noted that Plaintiff reported a long history of alcohol use, starting at age 13 in 1998. (*Id.*, at 204.) He also reported that he "began to drink over-the-counter cough syrup at age 16 in 2001 when he was depressed. He stated it was the only thing that made him feel better and was his preferred drug." (Record, at 204.) Plaintiff also reported using marijuana up to within a month of the evaluation, but a drug test showed he was positive for THC, the byproduct of marijuana use. (*Id.*, at 205.)

Dr. Satloff, a second psychiatrist, prepared a report after a preliminary examination of Plaintiff who had been referred to him for a psychiatric evaluation by Dr. Lenhard after Dr. Emani retired. (Record, at 144.) In his February 2, 2005, evaluative report, Dr. Satloff wrote that Plaintiff had bipolar disorder, serious depression in the 10th grade (at which time he was drinking heavily, smoking pot, and abusing cough syrup) and depression that lasted for many weeks. At the time of the February examination, plaintiff reported to Dr. Satloff that he had graduated from high school the previous year and was training to pursue a career as a professional wrestler. Dr. Satloff wrote, "[u]nfortunately, however, he smokes 2/3 of a pack of cigarettes a day, drinks alcohol occasionally, and occasionally uses marijuana." (Record, at 144.) Dr. Satloff also reported that Plaintiff had attention deficit hyperactivity disorder and was taking "Adderall XR and

amphetamine salts to supplement the Adderall when it wears off later in the day." (*Id.*) in

his assessment, as to diagnosis Dr. Satloff wrote Bipolar II Disorder and Attention Deficit

Hyperactivity Disorder. (*Id.*) in a follow-up visit sometime in 2005 (the photocopy of the

medical record included in the Commissioner's certified record of proceedings, cuts off

the exact month and day), Dr. Satloff wrote that Plaintiff reported a significant

improvement as a result of medication changes that were made at the time of the initial

visit and that, "[w]hen seen today, his mood was much better in terms of his affect. He is

eager to get into VESID and needs to complete a chemical dependency evaluation to

qualify. When seen today he also worked well in his therapy and reported full

compliance with his meds. He hasn't been sleeping because of a toothache, but he will

be seeing his dentist later today." (Record, at 142.) In another follow-up visit, this one on

April 26, 2005, Dr. Satloff wrote, "Pt. Reports that he's continued to do well. When seen

today, his mood was euthymic[1] and he informs me that he works out regularly." (*Id.*)

On May 3, 2005, Dr. Lenhard filled out A New York State Office of Temporary and

Disability Assistance, Division of Disability Determinations form in which she indicated

Treating Diagnoses for Plaintiff as follows: "Bipolar, ADHD, allergies, mild asthma." (Re-

cord, at 145.) She wrote that his current symptoms included distractibility, impulsivity,

depression and mood regulation issues. After listing the medications that he was taking

(Adderall, Seroquel, Trileptal and Zoloft), she answered the question, "[p]lease indicate

the expected duration and prognosis of the claimant's condition," with one word: "life-

---

1 "Euthymia is a word used for indicating a normal non-depressed, reasonably positive mood.
It is distinguished from euphoria, which refers to an extreme of happiness, and dysthymia,
which refers to a depressed mood. The term is also sometimes used referring to the neutral
mood (absence of a depressive or manic cycle) that some people with bipolar disorder
experience with varying frequency." Euthymia (medicine) (*available at* http://www.reference.
com/search?q=Euthymia+%28medicine%29, last checked Apr. 20, 2009).

time." Asked to list the history of her diagnoses, she wrote: "ADHD 3/98, Depression 3/02, Bipolar 2004." Next to the ADHD and depression entries, she wrote. "School impairment." (Record, at 146.) She further reported that per Plaintiff's mother, Plaintiff experiences severe fatigue once per month for two days at a time—"sleeps all day." (Id., at 147). Dr. Lenhard also wrote that his depression was primary to the fatigue. She further indicated, "[b]ased on the medical findings provided in my report, my medical opinion regarding this individual's ability to do work-related physical activities is as follows: full activities." (*Id.*) She listed no physical limitations and indicated no other conditions significant to recovery. (*Id.*, at 148.)

Dr. Satloff's records starting on May 3, 2005, sent to the ALJ on October 18, 2007, contain the following:

> June 21, 2005. Pt. Continues to do well. Mood is euthymic [with] good energy level. He has his first match on Saturday, and he is anxious about this. Clinically, I am pleased [with] his progress.

> August 23, 2005.[Per] consultation [with] PCP, Adderall was reduced to 30 mg. OD. He will be seen to PCP later today and she will be sending me all the most relevant findings. Pt. Continues to work out regularly, which provides a lot of satisfaction for him. Today [Plaintiff] was a much more active participant in his therapy and his mood was euthymic.

> October 24, 2005. Pt. Now taking 60 mg. Of Adderall XR and an occasional 5 mg. Regular Adderall tab (prescribed by Dr. Lenhard). His BP is "normal." When seen today, [Plaintiff] was in a euthymic mood [] with good participation in therapy. He is very diligent about medication compliance.

(Record, at 196.) The last entry is dated December 26, 2005, noting a failed appointment letter was sent. (*Id.*)

In a letter to the ALJ dated October 20, 2007, Dr. Lenhard wrote that, since May 4, 2005, she had seen Plaintiff six times and only once for his mental illness diagnoses.

She further stated that plaintiff was working with Dr. Satloff regarding his bipolar disorder. (Record, at 210.)

On November 2, 2007, Dr. Fasanello, a clinical instructor in psychiatry and private practitioner, who Plaintiff had started seeing on December 9, 2005, completed a Mental Impairment Questionnaire (Listings). He provided a DSM-IV multi-axial evaluation as follows:

Axis I: II Bipolar disorder depressed.

Axis II: personality disorder NOS.

Axis III: deferred.

Axis IV: severe.

Axis V: current GAF: severe.

Highest GAF past year: 48.

(Record, at 242.) In this section for "treatment and response," Dr. Fasanello wrote, "poor, seems to have chronic and persistent mental illness." (Id.) He listed Plaintiff's prognosis as poor to fair. On the remainder of the report, he indicated with check marks Plaintiff's signs and symptoms: anhedonia or pervasive loss of interest in almost all activities; appetite disturbance with weight change; decreased energy; impairment in impulse control; mood disturbance; difficulty thinking or concentrating; hyperactivity; motor tension; deeply ingrained, maladaptive patterns of behavior; pathological dependence, passivity or agressivity; emotional withdrawal or a solution; bipolar syndrome with a history of episodic periods manifested by the full symptomatic picture of both manic and depressive syndromes (and currently characterized by either or both syndromes); easy distractibility; autonomic hyperactivity; oddities of thought, perception, speech or behavi-

or; and involvement in activities that have a high probability of painful consequences which are not recognized. (Record, at 242-43.)

Dr. Fasanello also identified the following functional limitations: moderate restriction of activities of daily living; marked difficulties in maintaining social functioning; marked deficiencies of concentration, persistence or pace; and one or two repeated episodes of decompensation within a 12 month period, each of at least two weeks duration. He further indicated that Plaintiff had a medically documented history of a chronic organic mental, schizophrenic, or affective disorder of at least two years' duration that has caused more than a minimal limitation of ability to do any basic work activity, with symptoms or signs currently attenuated by medication or psychosocial support, and one of the following: a residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to be compensate. Finally, he indicated that on average, he anticipated that Plaintiff's impairments or treatment would cause him to be absent from work more than four days per month, that his impairment had lasted or could be expected to last at least 12 months and that it would still be disabling if Plaintiff did not use drugs or alcohol. (Record, at 244.) The remainder of Dr. Fasanello's records are hand-written and difficult to read. In his papers, Plaintiff has provided[2] a synopsis of them as follows:

> 01/02/2006 "Had only be [sic] sleeping 2 hours a night…pt [patient] seems to have some attention and cognitive deficits," (T.274).

> 01/27 "Somewhat labile…cognitive disturbance (deficits) continue…recent

2  The Commissioner has also provided a synopsis of the doctor's notes, and the Court has noted where the Commissioner's summary differs from Plaintiffs'.

exacerbation," (T.275).[3]

02/17 "Still needs to get blood test…pt w/ thought disorder, illogical, tangential…," (T.275).[4]

03/20 "Neck & back hurt…has been stable on the meds w/o [(without)] severe mood swings," (T.265).[5]

04/18 "Needs to get labs done…past hx [(history)] of Robitussin abuse…patient stable at this point with meds…diagnosed ADHD and bipolar disorder…pt continues in his wrestling activities…," (T.266).

05/16 "Very fatigued…He can't seem to tolerate a work environment w/ supervision, unstable & talks back & got fired at work, externalizing problems & blame two events on others than on him…he doesn't sleep…," (T.277). "He's seeming disorganized, directionless…has a negative reaction to engaging in any employment...," (T.279).[6]

06/09 "Pt has yet to get the lab tests I've wanted him to get to monitor the lipid risks…continue Zoloft, [illegible], Seroquel…, " (T.278).[7]

07/17 "Reveals anxiety disorder today, performance anxiety problems, panic feelings when ahead of people waiting in line, performance anxiety in the ring, pt fighting past anxiety problems w/ wrestling in front of a crowd, pt hands and feet get numb…," (T.272).

08/21 "2 car accidents in the past mos.… Hit a pothole…2nd accident 'due to a dumb broad'…[his] parents bought him a standard now, he's having high anxiety due to driving the 'new' car now—pt's life is chaotic, unplanned & directionless, but thinking of having a garage to work on cars w/ his friends now (friend's idea)," (T.273).

---

3  The Commissioner notes that Dr. Fasanello stated Plaintiff was "OK with present care," and that his medication seemed to be working. (Commissioner's Mem. of Law, at 7.)

4  The Commissioner notes that Dr. Fasanello stated that medication was controlling Plaintiff's symptoms and he was responding to treatment. (*Id.*)

5  The Commissioner notes that in a March 2006 visit (no specific date listed), Dr. Fasanello reported that Plaintiff had a good response to treatment, had been stable on medication and did not have severe mood swings. He also stated that Plaintiff's mood seemed responsive to bipolar therapy treatment and noted that Plaintiff had a negative reaction to engaging in any employment.  (*Id.*, at 7.)

6  The Commissioner adds, "[h]e also revealed that [P]laintiff 'can't seem to tolerate a work environment' with supervision because he 'talks back' and 'gets fired.' Tr. 277." (*Id.*, at 7.)

7  The Commissioner notes that Dr. Fasanello wrote that Plaintiff was "only on 25 mg. Seroquel & doing fine overall." (Record, at 278; Commissioner's Mem. of Law, at 7.) The Commissioner also states that on June 9, 2006, Dr. Fasanello noted that Plaintiff was doing fine overall and reported stability with his bipolar disorder. (*Id.*)

09/18 "Pt generally OK[8] at present," three medications are listed (T.271).

10/31 "BD [birthday] soon—23 days—he doesn't really care because turning 21 y.o. doesn't mean much anyhow—he denies any problems w/ drinking & driving…not working at all… pt & VESID didn't get along," (T.269).

11/21 and 12/19/2006 "Pt filed for assistance & job training programs," (T.270).

01/11/2007 "Not show for scheduled appt today," (T.268).

03/13 "He's emotionally & intellectually limited—pt reports no use of mood altering chemicals at all—pt just works infrequently, less than once every couple of weeks…," (T.268).

06/11 "Can't sleep when he's not taking the Seroquel—pt struggling to find work & a regular job at this time—patient not overtly psychotic—struggling to find his way in life w/ limited emotional & intellectual resources," (T.267).

11/01 "Patient not working—not functioning—not wrestling—Pt's been 'taking it easy the past couple of months'—couldn't work at Wegmans, even w/ job coach from BOCES, *etc*… ," (T.259).\

11/30/2007 "c/o [complains of] some insomnia at times—mood tired & exhausted …," (T.257).[9]

1/04/2008 "Pt feels pretty good, got through the holidays … Pt w/ good response to meds, or as much as possible, clean cut, well-groomed, presenting well—Pt working on disability issue at the time [(margin note):] dx [diagnosed] bipolar disorder, severe chronic… ," (T.258).[10]

(Pl.'s Mem. of Law, at 10-11.)

## JURISDICTION AND STANDARD OF REVIEW

Title 42 U.S.C. § 405(g) grants jurisdiction to district courts to hear claims based

on the denial of Social Security benefits. The issue to be determined by this Court is

whether the Commissioner's conclusions "are supported by substantial evidence in the

---

8  The Commissioner adds, "and was responding to medication and care. Tr. 271." (*Id*.)
9  The Commissioner adds that Dr. Fasanello wrote that Plaintiff had no unusual mood swings.
10 The Commissioner noted that Dr. Fasanello wrote that Plaintiff reported feeling pretty good, was getting long with his family fairly well, and had a good response to medication. (Commissioner Mem. of Law, at 8.)

record as a whole or are based on an erroneous legal standard." *Schaal v. Apfel*, 134 F.3d 496, 501 (2d Cir. 1998). Substantial evidence is defined as "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id*.

For purposes of the Social Security Act, disability is the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); *Schaal*, 134 F.3d at 501.

> The SSA has promulgated administrative regulations for determining when a claimant meets this definition. First, the SSA considers whether the claimant is currently engaged in substantial gainful employment. If not, then the SSA considers whether the claimant has a "severe impairment" that significantly limits the "ability to do basic work activities. If the claimant does suffer such an impairment, then the SSA determines whether this impairment is one of those listed in Appendix 1 of the regulations. If the claimant's impairment is one of those listed, the SSA will presume the claimant to be disabled. If the impairment is not so listed, then the SSA must determine whether the claimant possesses the "residual functional capacity" to perform his or her past relevant work. Finally, if the claimant is unable to perform his or her past relevant work, then the burden shifts to the SSA to prove that the claimant is capable of performing "any other work."

*Schaal*, 134 F.3d at 501 (Citations omitted). At step five of the five-step analysis above, the Commissioner may carry his burden by resorting to the Medical Vocational Guidelines or "grids" found at 20 C.F.R. Pt. 404, Subpart P, Appendix 2. *Pratts v. Chater*, 94 F.3d 34, 38-39 (2d Cir.1996) (citation omitted); *see also*, SSR 83-10 (Stating that in the grids, "the only impairment-caused limitations considered in each rule are exertional limitations.") However, if a claimant has nonexertional impairments which "significantly limit the range of work permitted by his exertional limitations," then the Commissioner

cannot rely upon the grids, and instead "must introduce the testimony of a vocational expert (or other similar evidence) that jobs exist in the economy which claimant can obtain or perform."[11] *Pratts v. Chater*, 94 F.3d at 39; *see also*, 20 C.F.R. § 416.969a(d).[12]

Under the regulations, a treating physician's opinion is entitled to controlling weight, provided that it is well-supported in the record:

> If we find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record, we will give it controlling weight.

20 C.F.R. § 416.927(d)(2); 20 C.F.R. § 404.1527(d)(2). However, "[w]hen other substantial evidence in the record conflicts with the treating physician's opinion . . . that opinion will not be deemed controlling. And the less consistent that opinion is with the record as a whole, the less weight it will be given." *Snell v. Apfel*, 177 F.3d 128, 133 (2d Cir. 1999) (*citing* 20 C.F.R. § 404.1527(d)(4)). "It is an accepted principle that the opinion of a treating physician is not binding if it is contradicted by substantial evidence, *Parker v. Harris*, 626 F.2d 225, and the report of a consultative physician may constitute such evidence." *Mongeur v. Heckler*, 722 F.2d 1033, 1039 (2d Cir. 1983).

## ANALYSIS

---

11 "Exertional limitations" are those which affect an applicant's ability to meet the strength demands of jobs, such as sitting, standing, walking, lifting, carrying, pushing, and pulling. "Non-exertional limitations" are those which affect an applicant's ability to meet job demands other than strength demands, such as anxiety, depression, inability to concentrate, inability to understand, inability to remember, inability to tolerate dust or fumes, as well as manipulative or postural limitations, such as the inability to reach, handle, stoop, climb, crawl, or crouch. 20 C.F.R. 416.969a.

12 20 C.F.R. § 416.927(d) provides, in relevant part, that, "[w]hen the limitations and restrictions imposed by your impairment(s) and related symptoms, such as pain, affect your ability to meet both the strength [exertional] and demands of jobs other than the strength demands [nonexertional], we consider that you have a combination of exertional and nonexertional limitations or restrictions.... [W]e will not directly apply the rules in appendix 2 [the grids] unless there is a rule that directs a conclusion that you are disabled based upon your strength limitations; otherwise the rule provides a framework to guide our decision."

Plaintiff argues that the ALJ "mis-evaluated the medical evidence, failed to apply the treating physician rule, and committed other legal errors." (Pl.'s Mem. of Law, at 18.) In particular, Plaintiff argues that the ALJ "first erred by rejecting treating physician opinion[s], particularly those of doctors Fasanello, a mental health specialist as a psychiatrist, and pediatrician Lenhard…." (*Id.*, at 20.) Plaintiff further contents that the ALJ "picked out isolated factors or events, and erroneously failed to evaluate the consistency of the evidence as a whole." (*Id.*)

### Disregarding treating physician opinions

The Commissioner argues that, although the ALJ gave some weight to Dr. Fasanello's opinion in the Mental Impairment Questionnaire (Listings), he did not give it controlling weight "because it was not well supported by the objective medical evidence of record and was inconsistent with Dr. Fasanello's own treatment notes. (Commissioner Mem. of Law, at 16; Record, at 20.) The Commissioner further observes that Plaintiff's treating psychiatrist from March 2003 until October 2004, Dr. Emami, "made no indications of any deficiencies in concentration or social functioning, or episodes of decompensation. Instead, Dr. Emami was more concerned with [P]laintiff's alcohol and drug dependency, and referred him to a chemical dependency program." (Commissioner's Mem. of Law, at 17.) In his decision, the ALJ noted that Plaintiff testified that he took care of his personal needs, drove a car, did household chores (Record, at 17, 87, 156-57), attended a hockey game, a rock concert and wrestling events with his friends (Record, at 17, 303-04). As indicated above, in his December 17, 2004, letter, Dr. Emami concluded that Plaintiff had benefited from psychotropic

medications, "but his substance abuse has remained a problem and needs further attention. [Plaintiff] has been quite ambivalent regarding seeking rehab and treatment in this regard." (Record, at 136.) The Commissioner also points out that Dr. Satloff, another of Plaintiff's treating psychiatrists, expressed opinions similar to Dr. Emami's. (Commissioner Mem. of Law, at 17-18; Record, at 142, 144, 196.) Finally, the Commissioner cites to the consultative examination by John Thomassen, Ph.D. (Record, at 154-58.) After examining Plaintiff on June 16, 2005, he diagnosed him as follows:

> Axis I: Alcohol dependence. Cannabis abuse. Bipolar I disorder, in remission with medication. Anxiety disorder, NOS.
>
> Axis II: No diagnosis.
>
> Axis III: Rule out allergies. Rule out asthma.

(Record, at 157.) Dr. Thomassen stated in his report that Plaintiff "is likely to benefit from the substance abuse treatment he is currently receiving and the medication that he is taking," and, in his Prognosis wrote: "[s]omewhat guarded given his multiple areas of difficulty at such a young age." (*Id.*) Dr. Thomassen also wrote, in the Current Functioning portion of his report, the following:

> Mr. Sullivan stated that he is occasionally sad. He denied excessive anger. He has had no aggression toward others for the last 3 years. He is occasionally anxious when he is around-doctors, new people, or at school. He tends to avoid new situations. He denied having any panics or compulsive behaviors. He stated that he had some up moods that last occurred a month before the exam when he spent a lot of money, was feeling like he was on top of the world and could do anything. He stated that he engaged in poor judgment such as kicking a girl's car and stated that he will typically have these moods for about 1 to 2 days' duration. He stated he last had a down mood a month before the exam when he was tired and sleeping excessively, but improved with his medication. He denied having any compulsive behaviors. He has always had a problem with distractibility.

His goal for the future is to be a professional wrestler. His energy level is low upon occasion. He denied hallucinations, delusions, suicidal or homicidal ideation. Sleep is excessive upon occasion. His appetite is low, which he attributes to his medications.

(Record, at 155.) Dr. Thomassen concluded that Plaintiff "should be able to perform rote tasks and follow simple directions. He may be able to do complex tasks consistent with his skill level. He is likely to have some problems relating with coworkers and coping with stress. Allegations of psychiatric disability were not fully consistent with exam findings." (Record, at 157.)

The opinions of two other consultative examiners were similar. Melvin Zax, Ph.D., examined Plaintiff on August 24, 2007, recommending that Plaintiff, "should be urged in the strongest terms to get himself into a rehab program and to take it seriously. I do not believe he has done that in the past and with his current attitude I fear his prognosis i[s] very poor." (Record, at 187.) He also observed that Plaintiff, "complains of depression and anxiety and makes a very weak case for both. On the other hand it is pretty clear that he has been addicted to marijuana and alcohol…[and] I believe he remains addicted and therefore, the examination results are not consistent with his allegations." (Record, at 187.)

Peter Crane, M.D., consultatively examined Plaintiff on June 16, 2005. When asked what his chief complaint was, Plaintiff responded that, "he has applied for Social Security Disability because he is unable to get a job."[13] (Record, at 159.) Further, Dr.

---

[13] Under the applicable statutes, "An individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work." 42 U.S.C. § 423 (2004); 42 U.S.C. § 1382c(a)(3)(B) (2004).

Crane reported that Plaintiff told him about his bipolar disorder, stating that he felt it was not "significantly detrimental to him." (*Id.*)

A third mental health professional,Thomas Harding, Ph.D., reviewed the records, but did not examine Plaintiff. Dr. Harding's Mental RFC Assessment, dated July 27, 2005, indicated that Plaintiff was only moderately limited in: the ability to understand and remember very short and simple instructions; the ability to carry out detailed instructions; the ability to maintain attention and concentration for extended periods; the ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; the ability to sustain an ordinary routine without special supervision; the ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; the ability to accept instructions and respond appropriately to criticism from supervisors; the ability to respond appropriately to changes in the work setting; and the ability to set realistic goals or make plans independently of others. (Record, at 165-66.)

The Commissioner also points out inconsistencies in Dr. Fasanello's treatment notes, which, he contends, do not support the doctor's conclusions of marked difficulties in maintaining social functioning; marked deficiencies of concentration, persistence or pace; and one or two repeated episodes of decompensation within a 12 month period, each of at least two weeks duration. *See* 20 C.F.R. § 1527(d)(4) (71 FR 16445, March 31, 2006) ("Generally, the more consistent an opinion is with the record as a whole, the more weight we will give to that opinion."). First, during Plaintiff's initial visit on December 9, 2004, Dr. Fasanello described Plaintiff's depression and anxiety as mild.

(Record, at 252.) Dr. Fasanello reported that Plaintiff told him that his problems stemmed from high school and had since improved and that his bipolar disorder was controlled. (*Id.*) The Commissioner emphasizes that in subsequent visits, Dr. Fasanello made no notes about "marked limitations in social functioning and concentration, persistence or pace and episodes of decompensation, but rather reflected improvement and stability in [P]laintiff's condition on medication." (Commissioner Mem. of Law, at 19-20.)

Based on its review of the evidence, the Court determines that the ALJ properly followed the treating physician rule. Where, as here, "other substantial evidence in the record conflicts with the treating physician's opinion…that opinion will not be deemed controlling. And the less consistent that opinion is with the record as a whole, the less weight it will be given." *Snell*, 177 F.3d at 133. In the ninth page of his decision, the ALJ gave a detailed explanation of why he was giving Dr. Fasanello's opinion less weight and granting more weight to the other opinions (Record, at 20). *See* 20 C.F.R. § 404.1527(d)(2) ("We will always give good reasons in our notice of determination or decision for the weight we give your treating source's opinion."). The ALJ's reasons are supported by substantial evidence in the Record. Accordingly, Plaintiff's motion for judgment on the pleadings with regard to the ALJ's determination of the weight to be given to Dr. Fasanello's opinion is denied.

### *Substantial Evidence Supports the ALJ's Decision*

The remainder of Plaintiff's memorandum of law makes a number of other arguments, attacking the ALJ's decision as being unsupported by substantial evidence. Plaintiff contends in part (B) of his memorandum of law that the ALJ erred by "failing to

fully apply the required analysis of the several factors enumerated in 20 C.F.R. §§ 416.927(d)(2) and 404.1527(d)(2)….” (Pl.'s Mem. of Law, at 20.) He further contends that, “[t]he record overall supports [Plaintiff]: the Victor School records, pediatrician Lenhard, psychologist Emami, psychiatrist Fasanello, Mrs. Sullivan's testimony, and [Plaintiff's], including his short-lived jobs with involuntary terminations and his criminal justice record evidencing his decompensation.” (*Id.*) Finally, he argues that, “[t]he record as a whole contradicts the ALJ's assertion that his disorders are 'controlled with medications,' (T.20).” (*Id.*)

Plaintiff's counsel writes that all his treating physicians “say he suffers from Bi-polar Disorder,” and one, Dr. Emami, adds that he suffers from a mood disorder and ADHD. (*Id.*) These points do not seem to be at odds with the ALJ's decision, since the ALJ determined at step two in the sequential analysis that Plaintiff suffered from “bipolar disorder, personality disorder, anxiety disorder and attention deficit hyperactivity disorder.…” (Record, at 14.)

With regard to part (C) of Plaintiff's memorandum of law, asserting that the overall Record fails to substantially support the Commissioner's ultimate determination, he argues that the consultative examiners' opinions do not provide substantial evidence, citing to *Odorizzi v. Sullivan*, 841 F. Supp. 72, 77-78 (E.D.N.Y. 1993); *but see Mongeur*, 722 F.2d at 1039 (“the report of a consultative physician may constitute” substantial evidence contradicting a treating physician's opinion”). Here, the ALJ used not only the consultative examiners' opinions, but their observations from their examination of Plaintiff (except for Dr. Harding) as well.

The ALJ, in making his RFC determination pursuant to 20 C.F.R. §§ 404.1546(c) and 416.946(c), is required to consider all the relevant evidence. 20 C.F.R. §§ 404.1545(a) & 416.945(a). In that regard, Plaintiff's July 26, 2004, IEP, which the ALJ notes the following conclusions:

Full Scale, Verbal and Performance IQ are all in the average range.

Works well independently when removed from social distractions.

Average abilities overall.

Has demonstrated strength in listening comprehension within the classroom.

Reading is slow but accurate.…

Good sense of humor, polite and cooperative. [Plaintiff] appreciates being treated fairly and honestly and responds likewise.

Responds well independently and with adult assistance.

Has demonstrated growth in overcoming frustration, (*i.e.*: using humor).

Has demonstrated self-advocacy skills.

When [Plaintiff] has demonstrated success with independent work he shows self-confidence.

Less impulsive verbally while on medication.

(Record, at 130.) The ALJ used that IEP to support his decision (Record, at 17), but in addition to the IEP, the ALJ relied on the reports of Plaintiff's treating physicians, as well as the Agency consultants. Dr. Satloff's notes dated October 24, 2005, indicated that Plaintiff was diligent about taking his medications and participating in therapy. Dr. Lenhard, in a May 3, 2005, assessment, indicated that, "[b]ased on the medical findings provided in my report, my medical opinion regarding this individual's ability to do work-related physical activities is as follows: full activities." (Record, at 147.) Dr. Emami, in his

May 3, 2004, letter, indicated that Plaintiff would be able to work, though would need "support and guidance" as well as "future trainings."[14] (Record, at 138.) Dr. Zax concluded that Plaintiff, "can follow and understand simple directions." (Record, at 187.) Dr. Thomassen concluded, that Plaintiff, "should be able to perform rote tasks and follow simple directions. He may be able to do complex tasks consistent with his skill level." (Record, at 157.) Dr. Fasanello described Plaintiff's depression and anxiety as mild and reported that Plaintiff told him that his problems stemmed from high school and had since improved and that his bipolar disorder was controlled. (Record, at 252.)

Plaintiff argues that the consultative examiners failed to comply with the require-ments of 20 C.F.R. §§ 404.1519n(c)(6), which provides in relevant part as follows:

> A complete consultative examination is one which involves all the ele-ments of a standard examination in the applicable medical specialty. When the report of a complete consultative examination is involved, the report should include the following elements:…

> (6) A statement about what you can still do despite your impairment(s), un-less the claim is based on statutory blindness. This statement should de-scribe the opinion of the medical source about your ability, despite your impairment(s), to do work-related activities, such as sitting, standing, walk-ing, lifting, carrying, handling objects, hearing, speaking, and traveling; and, in cases of mental impairment(s), the opinion of the medical source about your ability to understand, to carry out and remember instructions, and to respond appropriately to supervision, coworkers and work pres-sures in a work setting. Although we will ordinarily request, as part of the consultative examination process, a medical source statement about what you can still do despite your impairment(s), the absence of such a state-ment in a consultative examination report will not make the report incom-plete.

20 C.F.R. § 404.1519n(c)(6) (65 FR 11876, Mar. 7, 2000). Quoting from case law, He contends that the "consultative examiners' statements about his level of functional

---

14 Plaintiff points out that Dr. Emami closed his practice before the alleged disability onset date of April 2005. (Pl.'s Mem. of Law, at 8.)

impairment are too ambiguous to be meaningful. Their general use of terms such as "moderate" or 'mild,' without additional information, does not permit the ALJ to [infer the claimant] can perform specific exertional requirements [citation omitted],' *Soto v. Barnhardt*, 242 F. Supp. 2d 251, 256 (W.D.N.Y. 2003)." (Pl.'s Mem. of Law, at 21.) In *Soto*, and the case upon which it relies, *Curry v. Apfel*, 209 F.3d 117, 123 (2d Cir. 2000), the ALJs there relied on vague descriptions such as "mild" and "moderate" with regard to the plaintiff's **physical** RFC determination. As to physical limitations, the Commissioner has established objective criteria, involving hours and weights, to determine whether a claimant falls within the sedentary, medium, or heavy RFC. By contrast, the **mental** RFCs are defined using terms such as "mild," "moderate" and "marked." *See, e.g.,* 20 C.F.R. Pt. 404, Appx. P, § 12.04(C). The Court determines that substantial evidence supports the ALJ's conclusion that Plaintiff's only limitations were nonexertional: sufficient attention and concentration to understand, remember and follow simple instruction; limited to occasional interactions with the general public and occasional interactions with coworkers. (Record, at 16.) Since this case does not involve any question of physical limitations, the Court rejects Plaintiff's argument on the consultative examiners' use of the terms mild, or moderate.

In Part (D) of his memorandum of law, Plaintiff asserts that the "ALJ further erred by his misunderstanding of [Plaintiff's] impairments and their effects. On this point, Plaintiff argues that he improperly assumed the role of a health care professional, and substituted his own judgment or relative expertise against that of the treating health care professionals." (Pl.'s Mem. of Law, at 22 (citation omitted).) In particular, Plaintiff contends that the ALJ "demonstrated ignorance of the co-morbidity of Bipolar Disorder

with substance abuse….” (*Id.*) As to his co-morbidity argument, he cites to page six of his memorandum of law, in which he quotes from a National Institute of Mental Health pamphlet on signs and symptoms of mania and depression. (*Id.*, at 6.) However, this argument is not further developed, nor does he explain what is meant by "co-morbidity." The Court determines that the ALJ did not substitute his own judgment for the judgment of the medical professionals upon whose opinions and findings he relied in making his RFC determination.

In Part (E) of his memorandum of law, Plaintiff repeats the argument that the ALJ substituted his own interpretation of the medical records and what he calls "raw" data in making the RFC assessment. (Pl.'s Mem. of Law, at 23.) However, the ALJ here, in making his RFC determination, relied on medical evidence in concluding that Plaintiff could perform the full range of work at all exertional levels, but with two nonexertional limitations: sufficient attention and concentration to understand, remember and follow simple instructions; and limited to occasional interaction with the general public and occasional interaction with coworkers. (Record, at 16.)

In Part (F) of his memorandum of law, Plaintiff argues that the "ALJ's cross-examination did not reveal or establish that [Plaintiff] has a level of activity in which he can *sustain* work." (Pl.'s Mem. of Law, at 23-24 (emphasis in original).) Relying in part on *Leidler v. Sullivan*, 885 F.2d 291 (5th Cir. 1989), Plaintiff contends that the evidence in the Record does not show that he has the "ability to perform work-related activities on a *sustained* basis in the competitive setting; it evidences just the opposite." (Pl.'s Mem. of Law, at 24.) In *Leidler* the Fifth Circuit wrote, "In this case we revisit our decision in *Singletary v. Bowen*, 798 F.2d 818 (5th Cir. 1986), in which we considered the criteria

for assessing whether a person afflicted by a severe mental illness can obtain Social Security benefits." *Id*., at 292, and in *Singletary*, the Fifth Circuit held:

> A finding that a claimant is able to engage in substantial gainful activity requires more than a simple determination that the claimant can find employment and that he can physically perform certain jobs; it also requires a determination that the claimant can *hold* whatever job he finds for a significant period of time. *See Parsons v. Heckler*, 739 F.2d 1334, 1340 (8th Cir. 1984) ("the ability of a claimant to perform jobs in the national economy must take into account the actual ability of the claimant to find *and* hold a job in the real world") (emphasis added); *Tennant v. Schweiker*, 682 F.2d 707, 709-10 (8th Cir. 1982) (where individual bases his claim on a personality disorder, "the dispute focuses on whether the claimant has the emotional capacity to engage in sustained employment"). A determination that a claimant is unable to continue working for significant periods of time must, however, be supported by more than a claimant's personal history; it must also be supported by medical evidence. See 20 C.F.R. §§ 404.1546; 404.1560.

*Singletary*, 798 F.2d at 822. However, *Singletary* nor *Leidler* has been cited by any federal courts in the Second Circuit. Here, the evidence before the ALJ shows that Plaintiff, though young, was capable of holding a simple job for a year and a half while he was attending high school (Record, at 300-01), a job at a fast food restaurant. (Record at 154) and a job at BOCES for about eighteen months (Record, at 71). Therefore, the Record substantially supports the ALJ's finding that Plaintiff has an RFC for a full range of work at all exertional levels, but with nonexertional limitations.

Part (G) of Plaintiff's memorandum of law asserts that the ALJ "improperly discredited [Plaintiff's] symptoms and signs, which are well-supported by the health care and school records, as well as his mother's testimony." (Pl.'s Mem. of Law, at 24.)  In support, Plaintiff cites to 20 C.F.R. § 416.929. That regulation requires the Commissioner, when determining whether a claimant is disabled, to "consider all your symptoms, including pain, and the extent to which your symptoms can reasonably be accepted as

consistent with the objective medical evidence, and other evidence." Unfortunately, Plaintiff's argument in (G) is not further developed. Nonetheless, the Court has already determined that the ALJ's decision with regard to Plaintiff's RFC, as well as his partial rejection of the treating physicians' reports, is supported by substantial evidence in the Record.

In Part (H) of his memorandum of law, Plaintiff argues that the "ALJ also failed to properly assess[] [Plaintiff's] use of alcohol, cough syrup and marijuana, as already noted above regarding the co-morbidity of substance abuse with his diagnoses." (Pl.'s Mem. of Law, at 24.) Plaintiff refers, *inter alia*, to 20 C.F.R. § 404.1535(b)(2)(ii), which states, in pertinent part, as follows:

> (2) In making this determination, we will evaluate which of your current physical and mental limitations, upon which we based our current disability determination, would remain if you stopped using drugs or alcohol and then determine whether any or all of your remaining limitations would be disabling.…

> (ii) If we determine that your remaining limitations are disabling, you are disabled independent of your drug addiction or alcoholism and we will find that your drug addiction or alcoholism is not a contributing factor material to the determination of disability.

This regulation, as well as 20 C.F.R. § 416.935 both contain the following language in the beginning of the regulatory section: "*If* we find that you are disabled and have medical evidence of your drug addiction or alcoholism, we must determine whether your drug addiction or alcoholism is a contributing factor material to the determination of disability." *Id*. (emphasis added). Plaintiff also cites to *Orr v. Barnhart*, 375 F. Supp. 2d 193, 200-01 (W.D.N.Y. 2005), in which the district court stated,

> Pursuant to 42 U.S.C. § 423(d)(2)(C), a person found to be disabled after employment of the five-step sequential evaluation will not be considered

disabled within the meaning of the Act "if alcoholism or drug addiction would (but for this subparagraph) be a contributing factor material to" a finding of disability.…In this regard, the Commissioner must evaluate which of a disabled person's current physical and mental limitations would remain if plaintiff stopped using alcohol, and then determine whether those remaining limitations would be disabling. Id. at §§ 404.1535(b)(2); 416.935(b)(2). If her remaining limitations would still be disabling, then alcoholism will not be a contributing factor material to the determination of disability and the disabled person will be eligible for benefits.

*Orr*, 375 F. Supp. 2d at 200-201. Since the ALJ determined that Plaintiff was not disabled, and the regulation, by its plain language, applies only *if* the Commissioner determines a claimant is disabled, the Court rejects Plaintiff's argument.

Finally, in Part (I), Plaintiff argues that "the ALJ failed to consider or credit the effects of his medications, such as drowsiness and nausea (T.297)." (Pl.'s Mem. of Law, at 25.) When testifying, Plaintiff spoke about the side effects of the medications he used:

The Aterol and Zoloft upset my stomach in the morning. The Seroquel makes me hungry at night. Seroquel makes me kind of like lag in the morning, like I'm a little groggy for the first couple of hours. But like the worst side effect is like nausea and, I don't know, having to go to the bathroom even through I don't, from the Zoloft and Aterol. Or, I do, and that's no fun.

(Record, at 297.) The Commissioner's regulations state that,

Drugs used in the treatment of some mental illnesses may cause drowsiness, blunted effect, or other side effects involving other body systems. We will consider such side effects when we evaluate the overall severity of your impairment. Where adverse effects of medications contribute to the impairment severity and the impairment(s) neither meets nor is equivalent in severity to any listing but is nonetheless severe, we will consider such adverse effects in the RFC assessment.

20 C.F.R. Part 404, Appx. 1, § 12.00(D). Plaintiff does not cite to any portions of the medical records to support his complaint of side effects from the medications he used, or, to the extent they existed, that his doctors were unable to adjust the medications to

reduce or eliminate any side effects. *See Hoadley v. Astrue*, 503 F. Supp. 2d 466, 488 (D. Conn. 2007) ("The Court finds that the testimony of a vocational expert was not needed because plaintiff's alleged non-exertional impairments are not significant and are unsupported in the record.").

### Vocational Expert

The Court notes that the ALJ used the services of a vocational expert ("VE") and asked the VE the following hypothetical question:

> All right. Hypothetical number one: Assume a hypothetical individual of the same age, education, and work .experience as the claimant, who has the residual function capacity to perform a full range of work at all exertional levels, but with the following additional limitations: This individual would be limited to work that requires only sufficient attention and concentration to understand, remember, and follow simple instructions; therefore, the stress level would be lower than some more highly-skilled jobs. Secondly, the individual would be limited to only occasional interaction with the general public and occasional interaction with coworkers. Now, with those limitations, I'm assuming that the individual has no past relevant work. Are there any unskilled occupations an individual with the given profile described in my hypothetical could perform?

(Record, at 324-25.) This hypothetical question on the part of the ALJ was accurately constructed and properly reflected the RFC and nonexertional limitations he determined were applicable. Thus, he was entitled to rely on the VE's response. *Dumas v. Schweiker*, 712 F.2d 1545, 1553-54 (2d Cir. 1983). In the second hypothetical, the ALJ asked the VE the following:

> Now, for hypothetical number two, assume the limitations in hypothetical number one, and also assume that this individual would be off task, on average, 25 percent of the time. That's…assuming he either missed work, or while he's—while the individual's at work, he's not focused on the work, and not performing it up to standards, so he's off task 25 percent of the time. Are there any occupations an individual with that profile could perform?

(Record, at 326.) The VE answered the first hypothetical with two jobs that Plaintiff could perform, and for the second, said that there would be no work available, since he would "[b]e off task too much." (Record, at 326.) Plaintiff does not argue, and the Court does not find, that the second hypothetical described the RFC finding by the ALJ. As the Cort has already determined, the Record contains substantial evidence to support the ALJ's RFC determination and, consequently, the first hypothetical question and the VE's answer met the Commissioner's burden at the fifth step to show that that jobs exist in the economy which Plaintiff could perform. The VE testified that Plaintiff could perform the medium exertional level job of hand packager (920.587-018), of which 106,000 existed in the national ecomomy, and 460 in the Finger Lakes region. The VE also testified that Plaintiff could perform the light exertional level job of assembler, of which there were 372,106 in the national economy, and 1,080 in the Finger Lakes region. In addition, the VE told the ALJ that there were many other occupations he could identify for Plaintiff. (Record, at 325.)[15]

---

15Even if the VE had identified only one job that existed in sufficient numbers, the Commissioner would have met his burden at the fifth step. See Bull v. Commissioner of Soc. Sec., No. 1:05-CV-1232 (LEK/RFT), 2009 WL 799966 (N.D.N.Y. Mar. 25, 2009) ("Although [VE] identified only 'a single job, the Social Security Act affords benefits only to those who cannot 'engage in any other kind of substantial gainful work which exists in the national economy [.]" Renna v. Barnhart, 2007 WL 602395, at *5 (W.D.N.Y. Feb. 21, 2007) (citing 42 U.S.C. § 423(d)(2)(A) (emphasis added) & Dumas v. Schweiker, 712 F.2d 1545, 1553 (2d Cir.1983) (affirming step-five determination based on evidence of only one job))).

**CONCLUSION**

For the reasons discussed above, Plaintiff's application is denied and the Commissioner's motion for a judgment on the pleadings is granted. The Clerk is directed to enter judgment for the Commissioner.

IT IS SO ORDERED.

Dated:   May 12, 2009
         Rochester, New York

                        ENTER:

                        /s/ Charles J. Siragusa
                        CHARLES J. SIRAGUSA
                        United States District Judge